**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| JESUS LEMUS, | |
| Plaintiff, | |
| v. | Case No. 23-cv-108-MJS |
| GROVER MONTANO CORP., *et al.*, | |
| Defendants. | |

## MEMORANDUM OPINION

The facts of this case spring from a bathroom that sprung leaks. Two years after Plaintiff Jesus Lemus ("Lemus") hired Grover Montano and his business, Grover Montano Corporation (together, "Montano"), to renovate a bathroom in the basement of Lemus's home, the bathroom suffered leaks and water damage. Blaming Montano, Lemus sued. Through his operative complaint, Lemus presses statutory claims under the D.C. Consumer Protection Procedure Act (CPPA), D.C. Code §§ 28-3901, *et seq.*, along with common-law claims for breach of contract and negligence. Following discovery, and in response to Lemus's amended complaint, Montano now moves to dismiss or, in the alternative, for summary judgment. (ECF No. 39.) The Court agrees that Montano is entitled to summary judgment on Lemus's negligence claim, but concludes that genuine disputes of material fact preclude summary judgment as to Lemus's CPPA and breach-of-contract claims. So the Court **GRANTS IN PART** and **DENIES IN PART** Montano's motion.

**FACTUAL BACKGROUND**

The following facts are either undisputed or construed in the light most favorable to Lemus, as the non-moving party. *See* Fed. R. Civ. P. 56(a); *Doe v. District of Columbia*, 151 F.4th 435, 445 (D.C. Cir. 2025).

Lemus owns a residential property in Washington, D.C. (ECF No. 39-1, Defs.' Stmt. of Material Facts ("Defs.' Stmt.") ¶¶ 1–2.)[1] In March 2019, Lemus hired Montano to renovate a basement bathroom at that property. (*Id.* ¶ 5, 8–9.) In connection with the work, Lemus and Montano signed a three-page document—one that both sides agree formed a valid contract—that enumerated many of the project specifications and memorialized a total agreed cost of $50,000. (*Id.* ¶¶ 8–9; *see also* ECF No. 39-4.) Construction began in April 2019. (Defs.' Stmt. ¶ 10.)

Before hiring Montano, Lemus engaged other professionals to prepare construction plans and obtain the necessary permit approvals from the D.C. Department of Consumer and Regulatory Affairs ("DCRA"). (Defs.' Stmt. ¶¶ 19–20.) The DCRA approved those plans, and Lemus provided them to Montano with the understanding that Montano would follow them. (ECF No. 41-1, Pl.'s Opposing Stmt. of Material Facts ("Pl.'s Stmt.") ¶ 21; *see also* ECF No. 41-32 ("Lemus Decl.") ¶¶ 13, 23.) According to Lemus, the construction plans specified installation of the following, among other details: (1) "Durock" cement board; (2) a perimeter drain with a sump pit and sump pump; (3) a four-inch-thick gravel base in the concrete slab; and (4) expansion joints. (Pl.'s Stmt. ¶¶ 75, 77, 80, 83; *see also* ECF Nos. 41-24, 41-26.) But Lemus asserts that Montano did not adhere to these aspects of the construction plans, and that Montano did not disclose the resulting

---

[1] In keeping with the Court's Local Rules, *see* LCvR 7(h), Montano filed a statement of material facts, and Lemus filed an appropriate responsive statement. Where the Court cites to Montano's statement of facts, this is generally because Lemus expressly admitted the asserted factual proposition. In other instances, where the Court credits Lemus's factual assertions, the Court cites to Lemus's statement of facts.

deviations. (Pl.'s Stmt. ¶¶ 76, 78–79, 81–82, 84–85; *see also* Lemus Decl. ¶¶ 14–21.) As Lemus attested, he "always understood that [Montano] would not deviate from [the plans]." (Lemus Decl. ¶ 24.) Montano, on the other hand, points to evidence suggesting Lemus was kept apprised about at least some of these deviations and arguably approved them. (Defs.' Stmt. ¶ 14, 17.)

The renovation was finished by January 2020, and the completed work passed inspection by the DCRA. (Defs.' Stmt. ¶¶ 25–26.) At that point, Lemus began to use the new bathroom regularly. (*Id.* ¶ 27.) About two years later, in or around March 2022, Lemus noticed water stains on the bathroom walls and, following that discovery, contacted Montano to ask him to investigate the leaks. (Pl.'s Stmt. ¶¶ 72–73; *see also* Lemus Decl. ¶¶ 4–5, 7.) When Montano declined, Lemus filed a consumer complaint with the DCRA. (Defs.' Stmt. ¶ 28–29.) Lemus's complaint specified that: water was leaking through the shower walls, shower bench, and shower floor; no waterproofing was present in the wall; and the toilet plumbing was installed incorrectly and was leaking. (*Id.*) The DCRA complaint essentially went nowhere, and Lemus was otherwise unable to get Montano to engage. (Pl.'s Stmt. ¶ 35; Lemus Decl. ¶ 10, 12.) Meanwhile, Lemus hired other contractors to address the leaks and otherwise remediate the bathroom. (Lemus Decl. ¶ 8, 11.)

## PROCEDURAL BACKGROUND

Lemus filed this diversity action against Montano (both Mr. Montano individually and his eponymous contracting business) in January 2023, initially representing himself *pro* se. (ECF No. 1.) Montano answered the complaint in March 2023. (ECF No. 9.) Soon after, the case was referred to former Magistrate Judge Robin Meriweather for all purposes. (ECF No. 11; *see also* Min. Entry, Apr. 19, 2023.) Under the ensuing case schedule, discovery was originally scheduled to close on October 31, 2023, but that deadline was extended several times, ultimately through April 23, 2024. (*See* Min. Order, Oct. 20, 2023; Min. Order, Nov. 7, 2023; Min. Order, Feb. 23, 2024.) In the

3

meantime, in November 2023, Lemus retained counsel. (ECF No. 29.) In March 2024, Lemus moved for leave to file an amended complaint. (ECF No. 33.) Judge Meriweather granted the motion, *see Lemus v. Montano*, 2024 WL 3673572, at \*1 (D.D.C. Aug. 5, 2024), and Lemus docketed the amended complaint—now the operative pleading—in early August 2024. (ECF No. 38.) In response, Montano then filed the instant motion, seeking dismissal of the amended complaint or, alternatively, summary judgment. (ECF No. 39.)

During an earlier hearing, after the case was reassigned to the undersigned, Lemus withdrew certain components of his CPPA claims, which counsel separately confirmed through a formal submission. (ECF No. 45.)[2] Accordingly, at this juncture, Lemus's remaining claims in Count I allege that Montano violated the CPPA by misrepresenting or failing to disclose material facts. *See* D.C. Code § 28-3904(e), (f). Lemus also continues to press his claims for breach of contract and negligence. Montano's motion is now fully briefed. (*See* ECF No. 39-9 ("Defs.' Mem."); ECF No. 41 ("Pl.'s Opp'n"); ECF No. 42 ("Defs.' Reply"); ECF No. 44-1 ("Pl.'s Surreply").)[3] Following a motions hearing in late 2025 (*see* ECF No. 49), this ruling now follows.

## LEGAL STANDARD

The pending motion invokes both Rule 12(b)(6) and Rule 56 of the Federal Rules of Civil Procedure, seeking dismissal for failure to state a claim or, alternatively, summary judgment. The motion was accompanied by a statement of material facts not in dispute—as the Court's Local Rules require for a motion for summary judgment, *see* LCvR 7(h)—and a variety of evidentiary submissions outside the pleadings. In this context, where "matters outside the pleadings are

---

[2] The withdrawn claims alleged that Montano violated various technical aspects of the D.C. Municipal Regulations: 16 DCMR §§ 800.3, 808.1, 808.2, 808.3, 808.9, 808.10, and 808.15. (*See* ECF No. 45.)

[3] Although our Local Rules do not generally allow for any briefing beyond a reply, the Court in this instance granted Lemus leave to file a surreply without objection from Montano. (Min. Order, Oct. 11, 2024.)

presented to and not excluded by the court, the motion must be treated as one for summary judgment under Rule 56." Fed. R. Civ. P. 12(d); *see Marshall Cnty. Health Care Auth. v. Shalala*, 988 F.2d 1221, 1226 (D.C. Cir. 1993). The Court must ensure, though, that the parties are "given a reasonable opportunity to present all the material that is pertinent to the motion." Fed. R. Civ. P. 12(d). Applying these principles, the Court deems it appropriate to resolve Montano's motion through a summary-judgment lens under Rule 56, considering that the parties completed a full discovery period before Montano filed the motion, and both sides submitted—and rely on—a range of evidence outside the pleadings. Plus, Lemus was plainly on notice that Montano was seeking summary judgment and had ample opportunity to invoke Rule 56(d) if necessary.[4]

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A genuine issue of material fact exists if the evidence, viewed in a light most favorable to the nonmoving party, could support a reasonable jury's verdict for the nonmoving party." *Figueroa v. Pompeo*, 923 F.3d 1078, 1085 (D.C. Cir. 2019) (citation and quotation marks omitted). In carrying out this analysis, the Court does not "weigh the evidence and determine the truth of the matter" but instead determines only "whether there is a genuine issue for trial." *Waggel v. George Washington Univ.*, 957 F.3d 1364, 1371 (D.C. Cir. 2020) (citation and quotation marks omitted). "The movant bears the initial burden of demonstrating that there is no genuine issue of material

---

[4] *See* Fed. R. Civ. P. 56(d) ("If a nonmovant shows by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition, the court may: (1) defer considering the motion or deny it; (2) allow time to obtain affidavits or declarations or to take discovery; or (3) issue any other appropriate order."); *see also, e.g., U.S. ex rel. Folliard v. Gov't Acquisitions, Inc.*, 764 F.3d 19, 25–27 (D.C. Cir. 2014) (summarizing principles surrounding invocation of Rule 56(d) in opposing summary judgment). Lemus did not invoke Rule 56(d) in responding to the motion or otherwise claim that he was unable to present facts or evidence that he believed to be necessary to fairly oppose the motion.

fact." *Montgomery v. Risen*, 875 F.3d 709, 713 (D.C. Cir. 2017). "In response, the non-movant

must identify specific facts in the record to demonstrate the existence of a genuine issue." *Id.*

**ANALYSIS**

As previewed, Lemus presses three categories of claims against Montano: (1) violation of

the CPPA, D.C. Code § 28-3904(e), (f); (2) common-law breach of contract; and (3) common-law

negligence. The Court takes each in turn.[5]

## I.    Count I: CPPA Claims

Start with the CPPA claims. The CPPA is "a broad consumer protection statute." *District*

*of Columbia v. Facebook, Inc.*, 340 A.3d 1, 4 (D.C. 2025). The statute's purpose is to protect

"consumers against false, deceptive, or unfair business practices." *Earth Island Inst. v. Coca-Cola*

*Co.*, 321 A.3 654, 663 (D.C. 2024). It "'establishes an enforceable right to truthful information

---

[5] As an initial matter, the Court dispenses with a jurisdictional argument from Montano: that subject-matter jurisdiction is absent because discovery has supposedly shown that the case does not satisfy the amount-in-controversy threshold for diversity jurisdiction under 28 U.S.C. § 1332(a). According to Montano, Lemus produced invoices in discovery showing total payments of less than $75,000 expended on the bathroom, inclusive of amounts paid to Montano and the later contractors who completed repairs—amounts that fall below the necessary minimum. (Defs.' Reply at 7–9.) This argument fails at least twice over. First, by attempting to retabulate the amount in controversy at the close of discovery, Montano ignores that that issue must generally be evaluated "at the commencement of the action." *McQueen v. Woodstream Corp.*, 672 F. Supp. 2d 84, 87–88 (D.D.C. 2009); *see also, e.g.*, *Sykes v. Cook Inc.*, 72 F.4th 195, 205–06 (7th Cir. 2023) ("We assess the amount in controversy as of the date on which a case is filed in … federal court. If on the date of filing, the plaintiff could allege in good faith that over $75,000 was at stake, then the amount-in-controversy requirement is satisfied."). Granted, when "events occurring after the filing date … clarify what the plaintiff was actually seeking when the case was filed," *Sykes*, 72 F.4th at 206—*i.e.*, show that a plaintiff's claims could not have met the jurisdictional minimum at filing—that can be a basis to revisit the amount in controversy later in the case. But Montano does not grapple with that important nuance because they do not argue that that Lemus could not in good faith allege more than $75,000 to be at stake *at the time of filing*, as opposed to *now*, at the *close of discovery*. Second, even viewed through a post-discovery lens, the argument falls short. The CPPA, after all, provides for treble damages and reasonable attorneys' fees. *See* D.C. Code § 28-3905(i)(3)(B). The prospect of statutory trebling and a potential award of prevailing-party attorney's fees easily reveals that more than $75,000 remains in controversy. Jurisdiction exists.

from merchants about consumer goods and services,' and it is to be 'construed and applied liberally' to effectuate that purpose." *Id.* (quoting D.C. Code § 28-3901(c)).

Relevant here, subsection (e) prohibits a "misrepresent[ation] as to a material fact which has a tendency to mislead," while subsection (f) prohibits a "fail[ure] to state a material fact if such failure tends to mislead." D.C. Code § 28-3904(e), (f). Importantly, "[t]here is no requirement that the alleged misleading statement or omission be willful or intentional," at least for purposes of these two statutory subsections. *Earth Island*, 321 A.3d at 664 (cleaned up). More, "there is no requirement that any consumer in fact be misled by the deceptive statements." *Id.* An allegedly "unfair trade practice … is properly considered in terms of how the practice would be viewed and understood by a reasonable consumer." *Whiting v. AARP*, 701 F. Supp. 2d 21, 29 (D.D.C. 2010) (quoting *Pearson v. Chung*, 961 A.2d 1067, 1075 (D.C. 2008)); *see also Krukas v. AARP, Inc.*, 376 F. Supp. 3d 1, 39 (D.D.C. 2019) ("[A] statement or omission is material if a significant number of unsophisticated consumers would find that information important in determining a course of action.") (citations and quotation marks omitted). And whether a reasonable consumer would consider a statement or omission to be material is typically a question of fact for a jury. *See Saucier v. Countrywide Home Loans*, 64 A.3d 428, 445 (D.C. 2013).

Here, Lemus presses two separate (but overlapping) claims under the CPPA. Lemus asserts that Montano: (1) violated subsection (e) by affirmatively representing that they would complete the renovation work in compliance with applicable D.C. construction codes—codes that Lemus says required Montano to follow the DCRA-approved construction plans—but then deviating from those plans in several material ways; and (2) violated subsection (f) simply by failing to disclose the deviations from the construction plans, irrespective of any affirmative misstatement Montano

may have made on the subject. Because the latter theory is considerably more straightforward to resolve, at least as briefed by the parties, the Court starts there.

### A.    Omission-Based Claim: D.C. Code § 28-3904(f)

Lemus's omission-based CPPA claim rests on the proposition that Montano "never told him that they were deviating from the DCRA-approved plans" in completing the bathroom renovation, when Lemus "always understood that they would not deviate from them." (Pl.'s Opp'n at 26; *see also* Lemus Decl. ¶ 24 (same).) The Court has little trouble concluding that this theory, if proven, could support a viable CPPA claim. After all, it is no stretch to say that most homeowners who hire a contractor to perform renovation work on their property would reasonably expect the contractor to adhere to the approved construction plans for the project. And to the extent a contractor deviates from the plans, at least in some meaningful and material way, most reasonable homeowners would surely expect the contractor to disclose the change(s) and secure approval first. So framed, a jury may well find that a reasonable consumer would consider Montano's claimed omissions "important in determining a course of action" as to the renovation. *Saucier*, 64 A.3d at 445 (citation omitted). And as explained, Lemus points to sufficient evidence to create a triable issue of fact as to whether Montano violated the CPPA in this way.

Lemus identifies four aspects of the renovation work that he says did not adhere to the approved construction plans for the project: (1) the use of drywall instead of "Durock" cement board for the shower enclosure construction; (2) the failure to install a perimeter drain with a sump pump; (3) the failure to install a four-inch-thick gravel base in the concrete slab; and (4) the failure to use expansion joints. (Pl.'s Stmt. ¶¶ 75–86; Lemus Decl. ¶¶ 13–24.) More, Lemus presents admissible evidence—in the form of his sworn declaration testimony—to support his contention that Montano did not fully disclose these deviations from the construction plans. (*See id.*)

8

In response, Montano does not contest the first issue: Montano acknowledges they did not use "Durock" cement board, install a perimeter drain or sump pump, install a gravel base, or use expansion joints. But Montano presses a few arguments as to why those deviations cannot serve as a predicate for a CPPA violation. None persuades, at least not at summary judgment.

First, Montano says that none of the challenged specifications was "required by any applicable code or standard of care." (Defs.' Mem. at 9.) This misses the point. Lemus's claim is premised on the notion that the specifications were required by the approved plans, irrespective of whether any specific code provision(s) would have independently required them. So, the predicate omission stems from Montano's alleged failure to disclose various deviations from the *plans*, not from some specific code section or other general standard.

Second, Montano suggests that any departure from the plans should be excused because the plans "could not be exactly followed," including because they were "deficient," "schematic at best," and "cartoonish." (*See* Defs.' Stmt. ¶ 21; Defs.' Mem. at 11 n.2.) Even setting aside that the plans were approved by the DCRA—a fact that seems to seriously undercut the suggestion that they were "deficient" or "cartoonish"—Montano does not point to any evidence suggesting Montano ever shared complaints about the plans with Lemus, including as a potential reason to not follow them. Whatever Montano might have thought about the plans, Montano's alleged failure to disclose the challenged deviations is what is key to the CPPA omission claim.

Third, Montano suggests the plans did not actually require some of the challenged specs, asserting, for instance, that "some of the project drawings show a sump and some do not." (Defs.' Stmt. ¶ 22.) But Lemus disputes this point, and, based on the Court's own review, the plans do not obviously support Montano's view. Plus, Montano does not develop this argument as to the full set of challenged deviations. There is no argument, for instance, that the plans did not specify the

use of cement board, installation of a gravel base, and so on. Montano remains free to press these arguments at trial, but the facts are not so clear as to credit them at summary judgment.

Next, and perhaps most persuasively, Montano rejoins that they were "transparent" about the renovation throughout, maintaining that Lemus knew about any deviations from the plans and either agreed to them outright or at least knowingly acquiesced. (Defs.' Mem. at 3.) For example, Montano points to an April 2019 email that Lemus wrote to Montano stating, in relevant part:

> As we discussed earlier today, you do not see a need for a sublayer of gravel before laying the concrete slab. You do not foresee it cracking, given the reinforcement with the wire mesh and also the plastic layer that will protect the concrete slab from humidity. Your team will make sure that the areas where the drainage pipes are do have gravel to help in case of water exposure.

(Defs.' Stmt. ¶ 17; ECF No. 39-8, Defs.' Ex. 7.) As another example, Montano points to photos suggesting that Lemus knew, around that same time in April 2019, that Montano was not installing a perimeter drain or sump pump. (Defs.' Stmt. ¶ 14.) The Court acknowledges that this evidence undercuts Lemus's theory that Montano misleadingly omitted material facts about the renovation project, at least in certain respects. But even still, Lemus squarely disputes his knowledge of the various deviations with admissible evidence. (Lemus Decl. ¶¶ 14–24.) And Montano's competing evidence is not so cut-and-dry as to preclude a reasonably jury from crediting Lemus's version of events over Montano's. So, again, Montano remains free to highlight this evidence (and possibly other related evidence) at trial, and the Court expects that Montano will do so. But at summary judgment the Court must resolve these genuine factual disputes in Lemus's favor.[6]

---

[6] In the Court's view, Montano's evidence on this point is the most persuasive when it comes to the non-installation of the gravel sublayer, given Lemus's written acknowledgement of having "discussed" and seemingly approved that modification with Montano. (Defs.' Stmt. ¶ 17; Defs.' Ex. 7.) In response, Lemus says he did not realize at the time that the plans required the gravel sublayer, and, if he had so known, he would have objected and not gone along with the modification. (Lemus Decl. ¶ 27.) It is far from clear why Lemus would have been discussing the modification with Montano at all if it were not part of the approved plans, but the Court leaves that dispute to the trier of fact. In any case, even if the Court were to find as a

Finally, Montano suggests that Lemus's CPPA claim fails because he cannot show "willful disregard or malice." (Defs.' Mem. at 9; Defs.' Reply at 4.) But no such requirement exists under the statute. For CPPA claims arising under subsections (e) and (f), as here, the D.C. Court of Appeals has made clear that the statute does not require that the "alleged misleading statement or omission be willful or intentional." *Earth Island*, 321 A.3d at 664 (cleaned up).

At bottom, Lemus has come forward with sufficient evidence from which a reasonable jury could find that he expected Montano to adhere to the approved construction plans and that Montano misleadingly failed to disclose several material deviations from those plans. Summary judgment is not appropriate on the Section 28-3904(f) claim.

### B.       Misrepresentation-Based Claim: D.C. Code § 28-3904(e)

Lemus's affirmative-misrepresentation-based CPPA claim is more convoluted, but it likewise survives. According to Lemus, Montano stated they would complete the construction "in accordance with all applicable codes." From there, Lemus says that the "applicable codes" required the work to adhere to the DCRA-approved plans, such that Montano's commitment to comply with the "codes" was tantamount to a commitment to comply with the plans. And because Montano admittedly deviated from the plans in several material ways, Lemus argues that Montano misrepresented material facts in violation of the CPPA. *See* D.C. Code § 28-3904(e). For their part, in pursuing summary judgment on this variation of Lemus's CPPA claim, Montano largely rests on the same points just discussed, and the Court is equally unpersuaded the second time around. But beyond those points, Montano presses a couple of additional arguments.

---

matter of law that there was no misrepresentation by omission as to the gravel sublayer, Lemus's claim would still survive summary judgment based on the other challenged deviations from the plans.

For one, Montano disputes that the D.C. Code provision invoked by Lemus was applicable to this project at all. Lemus relies on Title 12A, Section 113 of the D.C. Municipal Regulations. That section provides, in relevant part, that it "shall be unlawful for any person to erect, construct, alter, extend, repair … any premises … in violation of … [a] permit or certificate, including the approved construction documents and approved amendments," *i.e.*, the plans approved by the DCRA. D.C. Mun. Regs. tit. 12A § 113.1. Montano contends this provision was inapplicable to Lemus's project because it comes from the Building Code (Title 12A), rather than the Residential Code (Title 12B), and Montano says that the latter governs detached one- and two-family dwellings like Lemus's property. (Defs.' Reply at 9–11.) That may be true as a general matter. But as Lemus rejoins (Pl.'s Surreply at 3–4), even treating the Residential Code as controlling, it still incorporates Chapter 1 of the Building Code, which includes the provision above. *See* D.C. Mun. Regs., tit. 12B §§ R101.1, R101.2.[7] Either way, then, the regulatory language Lemus invokes to connect the approved plans to the "applicable codes" applies here.

Otherwise, Montano contends that Lemus's claim suffers from a proof problem: the absence of evidence showing that Montano ever affirmatively said they would complete the renovation work pursuant to code or follow the construction plans. Set aside for a moment the headscratcher this argument creates. After all, it should go without saying that no reasonable homeowner would hire a contractor who did not plan to complete the construction work up to code and in keeping with the approved plans—affirmative assurances to that effect or not. All the same, Lemus's CPPA claim under subsection (e) requires an affirmative representation. And Lemus does not offer any contemporaneous evidence reflecting that Montano affirmatively stated they would

---

[7] *See* D.C. Mun. Regs. Tit. 12B § R101.1 ("The scope and intent of the Residential Code shall be governed by Chapter 1 of the Building Code, Title 12-A DCMR."); *id.* § R101.2 ("Administration and enforcement of the Residential Code shall be governed by Chapter 1 of the Building Code, Title 12-A DCMR.").

comply with the construction codes or follow the plans. Lemus does not even point to any supporting testimony from himself, whether in deposition or declaration. In fact, Lemus's declaration could be read to contradict that proposition, given his assertion that Montano "did not inform [him] that they were required to complete the work in accordance with the DCRA-approved plans[.]" (Lemus Decl. ¶ 22.) The state of the record on this point is sparse, to say the least.

That said, Lemus relies on a paragraph in Montano's answer to the original complaint admitting that Montano agreed to complete "certain remodeling construction and installation work … in accordance with all applicable codes." (Pl.'s Stmt. ¶¶ 68–69 (citing ECF No. 9 ¶ 29).) Given that the parties had a full opportunity for discovery—and considering that Lemus himself could have simply attested to Montano's affirmative representation on those points if he claims it to be true—this proffer is not particularly potent. But Rule 56 permits a party to support a fact with a variety of record material, "including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), *admissions*, interrogatory answers, or other materials[.]" Fed. R. Civ. P. 56(c)(1)(A) (emphasis added). And an opposing party's admission in an answer is no less an admission than any other variety. *See, e.g.*, *Evans v. Liberty Nat. Life Ins. Co.*, 2014 WL 5846730, at *3–4 (N.D. Okla. Nov. 12, 2014) (considering admissions contained in party's answer as appropriate record support at summary judgment); *Loc. Web Results, Series LLC v. Eli Glob., LLC*, 2024 WL 1119333, at *3 (M.D.N.C. Mar. 14, 2024) (same). To be fair, the Court expresses some skepticism about the ultimate persuasive value of that evidentiary support come trial. But viewing the evidence in the light most favorable to Lemus, as the Court must at this juncture, Montano's admission serves as adequate record support for the fact that Montano affirmatively agreed to complete the work in

13

accordance with "all applicable codes." And because the applicable codes required the work to be completed as specified by the approved plans, that suffices to allow the claim to proceed to a jury.

Because Lemus raises triable issues of material fact as to the affirmative-misrepresentation version of his CPPA claim, summary judgment is inappropriate.[8]

## II.    <u>Count II: Breach of Contract</u>

Next up, Lemus's claim for breach of contract. This claim presents a different gloss on the same overall theory underlying Lemus's CPPA claims: Lemus contends that Montano contractually agreed to perform the renovation work in accordance with the approved and permitted construction plans, and that Montano breached their contract in failing to do so.

To prevail on a breach-of-contract claim under D.C. law, "a party must establish (1) a valid contract between the parties; (2) an obligation or duty arising out of the contract; (3) a breach of that duty; and (4) damages caused by breach." *Tsintolas Realty Co. v. Mendez*, 984 A.2d 181, 187 (D.C. 2009). "The District of Columbia follows the objective law of contracts, which generally means that the written language embodying the terms of an agreement will govern the rights and liabilities of the parties, regardless of the intent of the parties at the time they entered into the contract[.]" *Armenian Assembly of Am., Inc. v. Cafesjian*, 758 F.3d 265, 278 (D.C. Cir. 2014) (cleaned up). But this can depend on whether the agreement is completely integrated—meaning an agreement "adopted by the parties as the complete and exclusive statement of the terms of the agreement." *Piedmont Resol., L.L.C. v. Johnston, Rivlin & Foley*, 999 F. Supp. 34, 49–50 (D.D.C. 1998) (quoting *Howard Univ. v. Good Food Serv., Inc.,* 608 A.2d 116, 126 (D.C. 1992)).

---

[8] Following the motions hearing, Lemus submitted a motion for leave to file a post-hearing brief that focuses on the evidentiary value of Montano's answer for purposes of opposing summary judgment. (*See* ECF No. 48.) Montano opposed. (ECF No. 49.) Because the Court did not consider the additional arguments in those additional briefs, and because the Court is denying summary judgment on the CPPA claims in any event, the Court **DENIES** the motion for leave to file.

Here, Lemus and Montano agree that they entered into a valid contract; both sides point to the same three-page document concerning the renovation signed on March 27, 2019. (Defs.' Stmt. ¶¶ 8–9; ECF No. 39-4.) Montano's pursuit of summary judgment focuses, instead, on arguing that Lemus cannot establish any contractual duty that Montano arguably breached by deviating from the plans, nor damages caused by any such claimed breach. Neither argument prevails.

To start, Montano argues there can be no breach because the contract "did not promise to follow the 'approved plans,'" but simply "enumerate[d] the services to be performed and materials intended for use." (Defs.' Mem. at 10–11.) Focusing strictly on the March 2019 agreement, Montano makes a fair point. And Lemus acknowledges as much. (*See* ECF No. 49, Hrg. Tr. at 44:10–12 (Lemus's counsel conceding no claim for breach of any written provision of the March 2019 agreement).) But Lemus says the Court should look beyond the four corners of that document to ascertain the scope of the parties' full understanding, including to the DCRA-approved construction plans, as well as to Montano's admission in the litigation that they agreed to perform the work in accordance with "all applicable codes." (Pl.'s Stmt. ¶¶ 68–69.) Montano disagrees, insisting that the Court should eschew any reliance on extrinsic evidence because Lemus fails to identify any ambiguous contractual terms in the March 2019 agreement. On balance, and at least in the present posture, Lemus has the better of this argument.

In arguing that the Court must focus exclusively on the March 2019 agreement, Montano fairly summarizes the parol evidence rule. (Defs.' Mem. at 11 n.2 (arguing that "[a]n unambiguous, completely integrated written agreement may not be contradicted, modified, or varied by prior or contemporaneous agreements or negotiations; to admit parol evidence, a court must determine that the language of the written agreement is ambiguous") (citing *Abdelrhman v. Ackerman*, 76 A.3d 883, 888 (D.C. 2013).) But in invoking that rule—and focusing on potential ambiguity—Montano

glosses over a core, predicate issue: whether the agreement is completely integrated in the first place. The parol evidence rule "only comes into play after the court has decided that the writing is completely, rather than partially, integrated." *Good Food Servs.*, 608 A.2d at 127; *see also Ghahremani v. Uptown Partners, L.L.C.*, 2005 WL 3211463, at *9 (D.D.C. Nov. 13, 2005) (same).

A completely integrated agreement "supersedes all other understandings and agreements with respect to the subject matter of the agreement between the parties, whether consistent or inconsistent[.]" *Ryan v. BuckleySandler, LLP*, 69 F. Supp. 3d 140, 145 (D.D.C. 2014) (quoting *Bank of Am. v. District of Columbia,* 80 A.3d 650, 676 (D.C. 2013)). So, in general, "[a] completely integrated contract may not be supplemented with prior representations not ultimately included therein, even if those representations are not expressly contradicted by the contract itself." *Hercules & Co. v. Shama Rest. Corp.*, 613 A.2d 916, 928–29 (D.C. 1992). This "contrasts with a *partially* integrated agreement, where the writing represents the agreement of the parties with respect to the matters stated therein, but where a court may consider extrinsic terms that are consistent with the partially integrated agreement." *Ryan*, 69 F. Supp. 3d at 145 (emphasis added) (citations omitted). "[W]hether an agreement is completely integrated is a preliminary question of fact for the trial court," focused on "the intent of the parties at the time they entered into the agreement." *Good Food Servs.,* 608 A.2d at 126 (explaining that courts must look to "the conduct and language of the parties and the surrounding circumstances" in ascertaining intent, without simply focusing on "[t]he document alone"). And more broadly, under D.C. law, "the proper interpretation of a contract … is a legal question." *Abdelrhman*, 76 A.3d at 887 (citation omitted).

Here, Montano makes no effort to argue that the March 2019 agreement is completely integrated. Lemus's briefing is no more helpful on this question; Lemus does not address at all whether the March 2019 agreement is completely or partially integrated. While the "Court is not

16

in the habit of doing parties' lawyering for them," *Jeffries v. Barr*, 965 F.3d 843, 860–61 (D.C. Cir. 2020), it is simply not prepared to conclude that the March 2019 agreement is a completely integrated contract, at least not on the current record as developed by the parties.

At a minimum, the Court expects Lemus and Montano may have reasonably intended that the three-page March 2019 agreement would be read and construed alongside the approved construction plans. (ECF Nos. 41-24, 41-26.) After all, the agreement speaks in broad and general terms when it comes to various aspects of the project—*e.g.*, "framing and installation of walls to separate new bathroom from living space," "create a new bathroom shower," "install new bathroom sink and vanity." (*See* ECF No. 39-4.) The construction plans, in turn, included floorplans, schematics, and considerably more detail as to how those tasks should be completed—*i.e.*, where and how the new bathroom separation walls would be framed and built, where and how the "new bathroom shower" would be constructed, where and how the "bathroom sink and vanity" would be installed, and so on. (ECF Nos. 41-24, 41-26.) Lemus testified that he provided those plans to Montano at the outset of the project (ECF No. 39-2, Lemus Dep. 92:10–15), and Montano does not dispute that fact. Further, the construction plans do not appear to be inconsistent with any terms in the March 2019 agreement. *See Segal Wholesale, Inc. v. United Drug Serv.*, 933 A.2d 780, 784 (D.C. 2007) (confirming that the consideration of extrinsic evidence "*consistent* with the terms of a partially integrated agreement is permissible"). So, in endeavoring to ascertain the parties' "intent … at the time they entered into the agreement," *Good Food Servs.*, 608 A.2d at 126, it is amply reasonable to believe they would have intended the construction plans to be read together with the March 2019 agreement. *See, e.g.*, *St. James Mut. Homes v. Andrade*, 951 A.2d 766, 770–71 (D.C. 2008) (finding that agreement was only partially integrated where it did not address key details of the parties' understanding). The Court is certainly not prepared to definitively say

otherwise at this stage. And because that remains a triable issue, there likewise remains a triable issue as to whether Montano breached the parties' agreement in failing to adhere to the plans.

Montano next argues that Lemus cannot establish any damages resulting from the claimed breaches. *See Brown v. Sessoms*, 774 F.3d 1016, 1024 (D.C. Cir. 2014) ("To prevail on a claim of breach of contract, a party must establish ... damages caused by breach.") (cleaned up). The Court disagrees. For one, Lemus introduced photographs and other related evidence reflecting water damage to the bathroom that Montano renovated, and Lemus points to invoices substantiating subsequent out-of-pocket costs on the repair work. (Pl.'s Stmt. ¶¶ 30–34; *see* ECF Nos. 41-13 through 41-23.) More, Lemus relies on an expert report from Reynaldo De Guzman, a professional engineer with decades of experience in building and home-improvement construction. (ECF No. 41-28.) Broadly speaking, Mr. De Guzman opines that the bathroom's leaks and resulting water damage were likely caused by Montano's deviations from the plans during the renovation. This evidence, certainly taken together, is enough to raise a triable issue as to the fact of damages.[9]

---

[9] Montano ventures a few arguments—in reply—as to why the Court should "disregard" the De Guzman report under *Daubert*. (Defs.' Reply at 11 (citing *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 590 (1993).) First, Montano calls Mr. de Guzman's analysis speculative because he did not personally "inspect the property." But the report explains that Mr. De Guzman based his analysis on various photographs of the site and the resulting damage—many of which were appended to the report—and his review of the DCRA-approved plans and other materials. Given that context, the Court disagrees that the absence of an in-person inspection automatically renders Mr. De Guzman's analysis so wholly speculative as to be unreliable and inadmissible under *Daubert*. Second, Montano faults Mr. De Guzman because "he has never served as an expert before" and apparently thought his deposition would only take thirty minutes. (*Id.* at 11–13.) These points likewise miss the mark. The rules surrounding the admissibility of expert testimony do not require prior expert-witness experience; if that were so, there would be no expert witnesses at all because every expert witness necessarily serves in that capacity for the first time at some point. And as to Mr. De Guzman's apparent misunderstanding about the deposition process, even if frustrating to Montano's counsel, it has nothing to do with the reliability and admissibility of the opinions in his report. The Court rejects Montano's invitation to categorically "disregard" Mr. De Guzman's opinions for the reasons suggested. But as discussed during the motions hearing, to remedy any prejudice to Montano flowing from the deposition misunderstanding, the Court will allow Montano a chance to depose Mr. De Guzman prior to trial.

Because a reasonable jury could conclude that Montano committed a breach of contract in carrying out the renovation work at issue by failing to adhere to the approved and permitted construction plans, the Court cannot grant summary judgment on this claim.

### III.    Count III: Negligence

That leaves Lemus's final claim for negligence. To prevail, he must prove that Montano: (1) owed him a duty, (2) breached that duty, and (3) proximately caused his injury with the breach. *See Poola v. Howard Univ.*, 147 A.3d 267, 289 (D.C. 2016). Montano urges summary judgment on several grounds, including that Lemus's negligence claim is an improper attempt to recast his breach-of-contract claim to sound in tort. (Defs.' Mem. at 12–13.) The Court agrees on that point.

Under District of Columbia law, a viable tort claim "must exist in its own right independent of [a] contract, and any duty upon which the tort is based must flow from considerations other than the contractual relationship." *Yerrell v. EMJ Realty Co.*, 281 A.3d 594, 598 (D.C. 2022) (quoting *Choharis v. State Farm Fire & Cas. Co.*, 961 A.2d 1080, 1089 (D.C. 2008)). "A tort is independent when 'an action for breach of contract would reach none of the damages suffered by the tort.'" *EDCare Mgmt., Inc. v. DeLisi*, 50 A.3d 448, 452 (D.C. 2012) (quoting *Choharis*, 961 A.2d at 1089). In other words, as the D.C. Court of Appeals has put it, "[t]he tort must stand as a tort even if the contractual relationship did not exist." *Choharis*, 961 A.2d at 1089; *see also EDCare Mgmt.*, 50 A.3d at 449 ("A breach of contract claim may not be recast as a tort claim.").

Here, Lemus's negligence claim does not stand independently from his contractual relationship with Montano. For starters, consider the near-perfect overlap between how these claims are pled in Lemus's amended complaint. (*Compare* ECF No. 38 ¶ 123 (alleging that Montano "breached the contract by failing to perform the work in accordance with all applicable codes, applicable laws, and approved plans"), *with id.* ¶ 127 (alleging that Montano "breached

their duty of care by failing to perform the home improvement work in a workmanlike manner and in accordance with all applicable codes, regulations, statutes, laws, approved plans, and industry standards").) As shown, Lemus alleges that the same alleged activity constituted a breach of contract and a breach of some duty of care. In other words, Lemus cannot plausibly demonstrate that Montano "owed [him] an independent duty beyond the parties' contractual obligations." *Seibert v. Precision Contracting Sols., LP*, 2019 WL 5864625, at *2–4 (D.D.C. Nov. 8, 2019) (dismissing tort-based fraud claim stemming from a construction contract dispute on this basis). Instead, the duty about which Lemus complains—to complete the renovation work in keeping with the codes, the approved plans and permits, and so on—"arose from the contractual relationship" between Lemus and Montano. *See id.* (citation omitted). These same theories are the whole thrust of Lemus's breach of contract claim, as discussed above.

Accordingly, Montano is entitled to summary judgment on Lemus's negligence claim.

## CONCLUSION

For the reasons explained, the Court **GRANTS IN PART** and **DENIES IN PART** Montano's motion, entering summary judgment in Montano's favor as to Lemus's negligence claim in Count III, but otherwise finding summary judgment unwarranted as to the CPPA and breach-of-contract claims in Counts I and II. The Court will issue a separate order so stating.

Dated: March 31, 2026

MATTHEW J. SHARBAUGH
United States Magistrate Judge
