**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

JESUS LEMUS,

Plaintiff,

v.

GROVER MONTANO CORP., *et al.*,

Defendants.

Case No. 23-cv-108-MJS

**FINDINGS OF FACT AND CONCLUSIONS OF LAW**

Jesus Lemus ("Lemus") hired Grover Montano Corporation and its owner, Grover Montano (together, "Montano"), to renovate the basement of his rowhouse in Washington, D.C. More than two years after Montano completed the work, Lemus discovered water damage. Faulting Montano, Lemus sued. After summary judgment, two of Lemus's claims—breach of contract and violation of the D.C. Consumer Protection Procedure Act ("CPPA")—proceeded to a bench trial. Lemus argued at trial that Montano breached the parties' agreement and violated the CPPA by deviating from the approved construction plans in several respects. After careful consideration of the evidence presented at trial, the Court finds that Lemus failed to prove his claims. For one thing, none of the challenged plan deviations breached any duty that Montano owed Lemus under their contract or amounted to a material misrepresentation or omission under the CPPA. And for another, Lemus failed to prove that any of the challenged deviations caused any recoverable damages. The Court therefore finds in favor of Montano and against Lemus.[1]

[1] As noted, Lemus sued *both* Grover Montano Corporation *and* Mr. Montano, individually. Because Lemus failed to prove his claims against both, the Court generally finds no need to distinguish between Mr. Montano and his business in this ruling, opting instead to refer collectively to the defendants throughout.

## RELEVANT BACKGROUND

Through his operative complaint in this case, Lemus asserted three claims for relief against Montano: (1) violation of the CPPA, D.C. Code §§ 28-3901, *et seq.*; (2) breach of contract; and (3) negligence. (*See generally* ECF No. 38, Am. Compl.) In response to the amended complaint, and after a meaningful period of discovery, Montano moved to dismiss or alternatively for summary judgment. Construing Montano's motion through a Rule 56 lens, the Court granted summary judgment in Montano's favor on Lemus's negligence claim but concluded that genuine disputes of material fact necessitated a trial on Lemus's CPPA and breach-of-contract claims. *Lemus v. Grover Montano Corp.*, 2026 WL 875112 (D.D.C. Mar. 31, 2026).

At the parties' request, the Court then approved a limited period for each side to complete certain "loose-ends discovery" before trial. (ECF Nos. 54, 55.) This included supplementation of written discovery, the ability to depose certain fact witnesses, and (another) chance to depose the other side's expert. (*See id.*) Thereafter, the parties completed their pretrial filings in July 2026, which included various motions *in limine*. Many of those motions were later withdrawn after the parties agreed to proceed to a bench trial in lieu of a jury trial. But the Court did rule on the parties' dueling motions *in limine* seeking to exclude certain expert opinions, denying both sets of motions through an oral ruling on the record at the pretrial conference. (*See* ECF No. 70.) The Court separately resolved, prior to trial, the question of whether the written contract between Lemus and Montano—a three-page document signed in March 2019—was completely integrated under D.C. law, determining that the contract was not completely integrated, but only partially integrated, meaning that, as part of their trial presentation on the breach-of-contract claim, both sides were free to introduce evidence of consistent additional terms, *see, e.g.*, *Howard Univ. v. Good Food Servs., Inc.*, 608 A.2d 116, 126 (D.C. 1992). (*See* Min. Order, July 6, 2026.)

The Court conducted a three-day bench trial on August 25, 26, and 27. Through his trial presentation, Lemus argued that Montano breached their contract and made material misrepresentations or omissions to Lemus in violation of the CPPA by deviating from the approved construction plans in several specific ways: (1) not installing a four-inch gravel base under the new concrete slab; (2) not installing a perimeter drain; (3) not installing a sump pit and pump; (4) not constructing expansion joints in the concrete slab; and (5) using gypsum board rather than concrete backerboard behind the tiles in parts of the bathroom shower. Under Lemus's theory, these deviations caused substantial water damage and ultimately required Lemus to hire another contractor to demolish and rebuild the shower and surrounding area in the bathroom. In defense, Montano contested that any of the challenged deviations breached the parties' contract or gave rise to any other CPPA violation. Montano also argued that Lemus could not prove any causal link between the challenged deviations and the water damage that gave rise to this suit.

During trial, the Court received dozens of exhibits and heard testimony from four witnesses.[2] Lemus and Montano each testified, and each presented an expert witness on construction-related issues and causation: Lemus called Reynaldo de Guzman, and Montano called Brian Bramel. During Lemus's case, Montano's counsel moved to dismiss for lack of subject-matter jurisdiction, arguing that the evidence failed to establish the necessary amount in controversy for diversity purposes. The Court denied that motion. (*See* Min. Entry, Aug. 25, 2026).[3] In addition, at the close of Lemus's case, Montano moved for judgment on partial findings under Fed. R. Civ. P. 52(c), which the Court likewise denied. (*See* Min. Entry, Aug. 26, 2026.)

---

[2] Specifically, the Court admitted at trial and considered the following exhibits: Joint Exhibits 1, 2, 4, 7, 9–13, 15–17, 21, 22, 24, 38, 59, 62–64, 66, 75, 85, 90, 93–95; Plaintiff's Exhibits 2–5, 7–15, 31, 33, 35–38, 95–100, 104, 209, and 219; and Defendants' Exhibits 1, 4, 5, 8, and 9.

[3] Counsel's argument on this point was a rehash of a near-identical argument that the Court rejected in its summary judgment ruling. *See Lemus*, 2026 WL 875112, at *4 n.5. It fared no better in a trial setting.

At the conclusion of trial, the Court took the matter under advisement. This opinion now serves as the Court's findings and conclusions. *See* Fed. R. Civ. P. 52(a)(1). After carefully considering the entirety of the evidence presented at trial, the Court finds that Lemus failed to carry his burden to prove that any of the claimed deviations from the plan drawings constituted a breach of the parties' contract or triggered any material misrepresentation or omission under the CPPA. Moreover, the Court finds that Lemus failed to prove—including by way of the causation theory proffered by his expert—that any of the challenged plan deviations caused the water damage that he sued over. Accordingly, the Court rules in favor of Montano and against Lemus.

## GENERAL LEGAL STANDARD

In a case tried without a jury, "the court must find the facts specially and state its conclusions of law separately." Fed. R. Civ. P. 52(a)(1). "The Court's findings must be 'sufficient to indicate the factual basis for the ultimate conclusion.'" *United States ex rel. Morsell v. NortonLifeLock, Inc.*, 651 F. Supp. 3d 95, 113 (D.D.C. 2023) (quoting *Kelley v. Everglades Drainage Dist.*, 319 U.S. 415, 422 (1943)). "But the judge need only make brief, definite, pertinent findings and conclusions upon the contested matters; there is no necessity for over-elaboration of detail or particularization of facts." *Id.* (quoting Fed. R. Civ. P. 52(a) advisory committee's note to 1946 amendment). In other words, "the Court need not address all the evidence presented at trial, and must simply make findings sufficient to allow the appellate court to conduct a meaningful review." *Wise v. United States*, 145 F. Supp. 3d 53, 57 (D.D.C. 2015).

## FINDINGS OF FACT

Based on the evidence introduced at trial, the Court makes the following factual findings.[4]

### I. The Renovation Project and the Parties' Contract

Lemus owns a residential property in Northeast Washington, D.C. (Jt. Stip. ¶ 1; Aug. 25, 2026 Trial Transcript ("Aug. 25 Tr.") at 23–24 (Lemus).) In early 2019, after walking past a Grover Montano Corporation van parked outside a neighbor's construction project, Lemus reached out to Montano to discuss a potential renovation of his basement. (Aug. 25 Tr. at 24–25 (Lemus).) Mr. Montano, the owner and president of the company, then met with Lemus to discuss the project and walked Lemus's property so he could prepare an estimate. (Jt. Stip. ¶ 2; Aug. 25 Tr. at 24–25, 49 (Lemus); Aug. 26, 2026 Trial Transcript ("Aug. 26 Tr.") at 25–26 (Montano).)

Montano agreed to take on the project, and on March 27, 2019, Lemus and Montano signed a contract memorializing the agreed scope of work. (Jt. Ex. 1.) That three-page document enumerated 32 separately numbered construction tasks, ranging from securing the necessary dumpsters, to demolition of the existing concrete floor, to construction of a new bathroom (including a new shower), to relocation of the laundry area, and more. (*See id.*) Relevant to the claims pressed at trial, the scope of work expressly included "[l]aying of gravel base," "[i]nstallation of moisture barrier," and "[l]aying of reinforcement wire mesh," but did not mention installation of a perimeter drain, a sump pit and pump, or expansion joints. (*See id.*)

The March 2019 contract listed a total price of $50,000, to include "building materials and labor, but excluding finishing materials" to the extent specified. (*See id.*) The contract stated there

[4] The parties stipulated to various facts in their joint pretrial statement. (ECF No. 67 § IV ("Jt. Stip.").) Where applicable, the Court cites to those joint stipulations of fact.

would be “no additional cost … except if homeowner does modifications.” (*See id.*) Lemus prepared the contract after discussion with Montano. (Aug. 25 Tr. at 35–36 (Lemus).)

On a separate track, Lemus obtained the required building permits and submitted proposed construction plans without Montano’s involvement, working instead with a different company. (Aug. 25 Tr. at 26 (Lemus).) Once approved, Lemus personally picked up the permits and the approved construction plans from the city and placed a copy of the plans at the worksite. (*Id.* at 26, 30 (Lemus); Pl.’s Ex. 209.) Lemus had previously emailed Montano a preliminary copy of the drawings before they were formally approved. (Aug. 25 Tr. at 100 (Lemus).)

The approved plans included a cover page, a comparison of the existing and proposed layouts, a slab schematic, an interior wall schematic, a plumbing schematic, and an electrical schematic. (Jt. Ex. 38.) The top right corner of the cover page included a conspicuous notation that read, “NO LOWERING BASEMENT SLAB.” (*Id.*) On the slab schematic, the drawing referenced a sump pump and a perimeter drain, and it included a graphic reflecting a “typical slab on grade detail” with four inches of gravel. (*Id.*) The interior wall schematic included a drawing labeled “bathroom wall detail” that referenced “Durock cement board” or “Hardibacker.” (*Id.*)

Montano began the construction shortly after Lemus obtained the permits and approved drawings. Lemus visited the site several times while the work was underway, at least during the early phases, including to walk the project with Mr. Montano after the old concrete floor was excavated and before the new concrete slab was poured. (Aug. 25 Tr. at 46, 49 (Lemus) & Aug. 26 Tr. at 27-28 (Montano).) Lemus took photographs of the renovation throughout the project. (Aug. 25 Tr. at 51 (Lemus); *see also, e.g.*, Jt. Exs. 17, 59, 62, 63, 66, 75; Pl.’s Ex. 209.)

Lemus and Montano agreed to a few expansions of the original scope of work after the construction began. Montano agreed, for example, to replace all the basement drains for an

additional $1,500. (*See* Jt. Ex. 2; Aug. 25 Tr. at 36–37 (Lemus).) Montano later agreed to take on other tasks, too, including additional plumbing, HVAC-related updates, insulation, and more, all for an added cost. (Jt. Ex. 85 at 37; Aug. 25 Tr. at 43 (Lemus).) Based on the evidence, the Court finds that the parties would typically memorialize these scope expansions in writing.

Montano completed the project in or around December 2019 or January 2020 (Aug. 25 Tr. at 55 (Lemus)), although Lemus separately hired other specialists to complete some aspects of the finishing work—for instance, another contractor colored and polished the concrete floors, and a separate contractor installed the glass shower wall in the bathroom. (Aug. 27, 2026 Trial Transcript ("Aug. 27 Tr.") at 33–35 (Lemus); Aug. 26 Tr. at 45–48, 61–62 (Montano).) The completed renovation work passed all required inspections—building, electrical, and plumbing. (Aug. 25 Tr. at 106 (Lemus); Aug. 26 Tr. at 37 (Montano); Defs.' Ex. 9.) Lemus paid Montano a total of approximately $57,000 for work on the project. (Aug. 25 Tr. at 122 (Lemus).)

## II. Lemus Discovers Water Damage in the Bathroom

Lemus used the basement bathroom sparingly for the first few years. He only began using it more consistently in early 2022, upon returning from a stretch working abroad. (Aug. 25 Tr. at 58 (Lemus).) In or around March 2022—more than two years after Montano completed the project, and after only a couple months of Lemus using the shower more regularly—Lemus observed water pooling on the floor outside the shower and discovered an area of water damage on the wall adjacent to the shower. (*Id.* at 58–60 (Lemus); Pl.'s Ex. 8, 15.) There was no evidence presented at trial concerning the presence of water damage before that timeframe.

According to Lemus, when he contacted Montano about the damage, Montano said he would only come back to inspect the problems if Lemus paid him for the additional time. (Aug. 25 Tr. at 61–64 (Lemus).) For whatever reason, Montano did not come out to assess the damage

or work with Lemus on any sort of fix.[5] In light of that, and believing he needed to address any problem before it got worse, Lemus hired Roto-Rooter to investigate. (*Id.* at 64–66; Jt. Ex. 11.) According to the Roto-Rooter invoice, the specialist who inspected the shower and surrounding area in April 2022 opined that the damage was caused by "leaks … from shower tiles." (Jt. Ex. 11; Aug. 25 Tr. at 114 (Lemus).) From there, Lemus hired another contracting company, Greenwood Construction ("Greenwood"), to repair the damage; Greenwood ended up demolishing and rebuilding the shower area. (Aug. 25 Tr. at 67 (Lemus).) According to Lemus, Greenwood tried to determine if there was an easier fix but told Lemus that "it was obvious that water was going through the tiles and in different directions." (*Id.*) The demolition of the shower uncovered noticeable water damage behind the tile and walls. (Pl.'s Exs. 2–5, 7, 35.) There was no evidence presented of any other water damage discovered anywhere else in the basement around that time.

Greenwood demolished and then rebuilt the shower in mid-2022 at a total cost to Lemus of approximately $22,000. (Tr. at 81-89; Jt. Exs. 7, 9–13.) There was no evidence presented at trial to show that after Greenwood completed the remediation and rebuild in 2022, any similar or additional water damage occurred in or around the shower area of the bathroom.

## III. The Challenged Deviations from the Construction Plans

As previewed, Lemus's claims focus on several specific aspects of Montano's renovation work that Lemus claims improperly deviated from the approved construction plans. Given the centrality of these issues, the Court walks through the relevant evidence as to each.

### A. The Four-Inch Gravel Base

First, Lemus focuses on Montano's non-installation of a four-inch gravel base beneath the new concrete slab in the basement. The contract did expressly include this deliverable in the agreed

[5] Montano did not offer any testimony or evidence on this issue, contrary or otherwise.

scope of work: "[l]aying of gravel base." (Jt. Ex. 1.) Beyond that general reference, though, the contract did not specify the depth of the gravel base, whether at four inches or otherwise. Lemus points to a section of the construction plans depicting a "*typical* slab on grade detail" that includes a reference to "4" gravel." (*See* Jt. Ex. 38 (emphasis added).) As Lemus reads that section, despite being labeled as depicting a "*typical* slab," it means the plans *required* 4 inches of gravel. The Court does not read the plans so rigidly, particularly since no other evidence established that this was a hard-and-fast requirement, whether by code or otherwise.

Once the project was underway and the old concrete slab was demolished, Montano determined he could not place four inches of gravel because that would mean the finished construction would not satisfy the minimum height requirement between the footings and the basement ceiling. Instead, Montano used two inches of gravel sublayer, not four inches, so that the construction would satisfy the height requirement. (Aug. 26 Tr. at 29, 32–34, 42–43 (Montano); Jt. Stip. ¶ 6.)[6] Montano testified that he discussed this issue with Lemus, and the Court credits that testimony, especially since other evidence supports it. In late April 2019, before the new concrete was poured, Lemus emailed Montano, in relevant part: "As we discussed earlier today, you do not see a need for a sublayer of gravel before laying the concrete slab." (Jt. Ex. 24.) The Court acknowledges some incongruence across this evidence—Montano's testimony that he installed two inches of gravel, versus Lemus's email appearing to state that Montano would not install *any* gravel sublayer—but the key takeaway holds either way: Montano discussed the non-installation

[6] Montano also installed the plastic moisture barrier and wire mesh beneath the slab, both of which were specified in the contract's scope of work. (Jt. Ex. 1 ¶¶ 8–9; *see also* Jt. Exs. 59, 62, 66, 75.)

of a four-inch gravel sublayer with Lemus, and Lemus understood from that discussion that Montano would not be installing four inches of gravel beneath the new slab.[7]

### B. The Perimeter Drain and Sump Pit and Pump

Next, Lemus takes issue with Montano's non-installation of a perimeter drain and a sump pit and pump in the basement slab. Unlike the gravel sublayer, the contract did not expressly include these deliverables in the agreed scope of work. (*See* Jt. Ex. 1; Aug. 25 Tr. at 119, 125 (Lemus).) The contract notwithstanding, Lemus relies on two references in the slab schematic of the plan drawings. One reads "perimeter drain, typ" and points to a dotted line that appears to depict a drain around the slab perimeter, and the other reads "sump pump" and points to a circle in the upper right corner. (Jt. Ex. 38.) Once again, Lemus construes both references as a plan-imposed *requirement* for a perimeter drain and sump pump. But once again, the Court is not convinced. For starters, the perimeter drain reference is accompanied by the qualifier "typ"—*i.e.*, typical—which strongly indicates that it depicts the features of a *typical* build rather than an absolute requirement for this specific project. And although the sump pump reference does not include that same qualifier, the Court believes other aspects of the drawings undermine a finding that the sump pump depicted on the schematic was a requirement, including the fact that the sump

[7] The Court found Lemus's testimony about the gravel, in particular, to be a bit cagey. After Lemus testified about the above email—which was meant to memorialize a discussion with Montano about not installing a full gravel sublayer—Lemus's counsel asked him, "[D]id [Montano] ever tell you that the required gravel base had not been installed to the specific depth"; Lemus answered with a categorical, "No." (Aug. 25 Tr. at 76 (Lemus).) That answer did not make sense given Lemus's email and related testimony, so the Court followed up. Apparently, in answering counsel's question with an unqualified "No," Lemus was splitting hairs over the question's use of the word "required"—*i.e.*, Lemus explained that, although Montano explained he was not installing gravel to a certain depth, Montano did not tell him that the plans supposedly *required* the gravel. (*Id.* at 76–77 (Lemus).) But notably, Lemus's original answer to counsel did not make any effort to provide that context. While not outright misleading, this anecdote struck the Court as an example of Lemus trying to shade his testimony in a light more favorable to him.

pump appears to be situated in a location that would impede both the hallway access into the relocated laundry area and the new sink in the laundry area. (*See* Jt. Ex. 38.)

The parties stipulated that Montano did not install a perimeter drain, sump pit, or sump pump. (Jt. Stip. ¶ 5; Aug. 26 Tr. at 73 (Montano).) Montano testified that after he excavated the old concrete slab and observed the footings, he told Lemus that he could not dig down further to install drain tubes or a sump pump because he would need to go under the footing and lower the slab more, which the plans did not authorize. (Aug. 26 Tr. at 29–30, 40–41, 81–84 (Montano).[8] More, Montano testified that Lemus understood and agreed with that limitation. (*Id.* at 89.) The Court credits that testimony, notwithstanding Lemus's contrary account. And even though there is no accompanying email explicitly memorializing these points, it strikes the Court as likely that these topics would have been addressed as part of the broader discussion when Lemus walked the jobsite with Montano before the new concrete was poured and the two spoke about the overall inability to excavate further, as would have been required for Montano to complete these items.

### C. The Concrete Expansion Joints

In addition, Lemus complains about the non-installation of expansion joints in the concrete slab. Here again, the contract did not include this deliverable in the agreed scope of work. (*See* Jt. Ex. 1; Aug. 25 Tr. at 119, 125 (Lemus).) But Lemus points to a section of the construction plans that reference a "typical control joint @ slab on grade" (Jt. Ex. 38), arguing that this language meant control joints were required for this project. But for the same reasons explained, the Court does not read the plans so definitively, especially given the use of the "typical" qualifier. Otherwise, there was very little evidence presented during trial on the issue of expansion joints—the subject essentially just fell by the wayside over the course of the proceedings.

[8] Recall the prominent disclaimer on the plans: "NO LOWERING CONCRETE SLAB." (Jt. Ex. 38.)

### D. Gypsum Board Substrate vs. Concrete Backerboard

Finally, Lemus faults Montano's use of green gypsum board instead of "Durock" cement board as a tile substrate in the bathroom shower. The contract did not specify a particular material to be used for that purpose. (Jt. Ex. 1; Aug. 25 Tr. at 125 (Lemus).) The plans, though, did include several wall schematics, including a "bathroom wall detail" that identifies "1/2" Durock/cement board or 1/4" Hardibacker." (Jt. Ex. 38.) Based on the evidence, cement board is somewhat more resilient to moisture than gypsum board. (Aug. 25 Tr. at 152 (de Guzman).)

The parties stipulated that Montano "used green gypsum board in at least part of the shower enclosure rather than Durock cement board." (Jt. Stip. ¶ 7.) Montano *did* use cement board for at least the bench seat in the shower, but elsewhere in the shower enclosure, he used the green gypsum board as the substrate material. (Aug. 26. Tr. at 53-56 (Montano).) Montano did not tell Lemus that he used gypsum board instead of cement board in some areas. (Aug. 25 Tr. at 75 (Lemus); Aug. 26 Tr. at 92 (Montano).) Both experts agreed that in today's world—for construction being completed in 2026—the best practice would be to use cement board for an enclosed shower area. (Aug. 25 Tr. at 212–13 (de Guzman); Aug. 26 Tr. at 133–35 (Bramel).) But based on the evidence, the Court finds that it was not improper or even necessarily unusual to use green gypsum board for that purpose, at least during the time of this job. (Aug. 26 Tr. at 56–57 (Montano).) Both materials were code-compliant when this work was done in 2019. (Aug. 26 Tr. at 56 (Montano); Aug. 26 Tr. at 133–35 (Bramel); Aug. 25 Tr. at 212–13 (de Guzman).)[9]

[9] De Guzman originally said gypsum board would *not* be a code-compliant material for this use. But on cross, he could not identify the code section that would have required cement board, and he ultimately conceded to being unsure either way. (*See* Aug. 25 Tr. at 213 (de Guzman) (Q: "Can you identify the governing code, sitting here today, that requires Durock versus the green board?" A: "No, I cannot really attest to that right now." Q: "Is there one?" A: "I believe so." Q: "But you're not sure?" A: "No.").) Relatedly, de Guzman pointed to a specification sheet for green gypsum board that suggests that it was "not suitable for use as a substrate for tile in wet areas such as tubs and showers," but there was no evidence establishing the date of that document, let alone that it was guidance applicable during this build in 2019.

## IV. Damages

During trial, Lemus introduced evidence concerning two general categories of damages.

The first category focused on additional financial costs that Lemus incurred to fix and reconstruct the bathroom shower area after discovering the water damage. He paid $263.94 to Roto-Rooter to complete the initial assessment and investigation. (Aug. 25 Tr. at 65–66 (Lemus); Jt. Ex. 11.) He paid $15,000 in labor costs to Greenwood to complete the remediation and reconstruction work. (Aug. 25 Tr. at 81–84 (Lemus); Jt. Ex. 9.) He paid $3,122.13 for new shower glass. (Aug. 25 Tr. at 84-85; Jt. Ex. 7.) And he paid $4,399.39 for new shower tiles across three transactions from two different stores. (Aug. 25 Tr. at 85–89; Jt. Ex. 10 ($1,347.68); Jt. Ex. 12 ($824.95); Jt. Ex. 13 ($2,226.76).) Taken together, this evidence established that Lemus spent a total of $22,785.46 on the shower-related repair work in the basement bathroom.

The second category of damages focused on additional remediation measures for the overall drainage set-up in the basement. Specifically, Lemus's expert witness, de Guzman, recommended several modifications to the basement with rough cost estimates associated with each: (1) the installation of a perimeter drain and sump pit and pump (roughly $20,000); (2) the installation of trench drains (roughly $3,000); (3) the installation of a dehumidifier within the HVAC system (roughly $800); (4) the creation of expansion joints in the concrete slab (roughly $1,500); and (5) the treatment of any new mold as soon as it is discovered (roughly $20 to spray for mold and mildew removal). (Aug. 25 Tr. at 165–73 (de Guzman).) On cross examination, however, de Guzman admitted that those cost figures were just "guesstimates." (*Id.* at 176–77 (de Guzman).) He acknowledged, for instance, that his $20,000 estimate to install a perimeter drain and sump pit and pump could be as low as $10,000, or anywhere in between. (*Id.*) And even on redirect from Lemus's own counsel, de Guzman confirmed the same point: "to really close the gap

between the guesstimate and the actual costs of the construction remedies, I have to do quantifiable items, like how many gravel, how many concrete, how many linear feet of pipe, and all those kind of things"—things that he did not do. (Aug. 26 Tr. at 11–12 (de Guzman).)

**V. Causation**

To attempt to establish a causal link between the challenged deviations from the plans and his claimed damages, Lemus put forward his expert witness, de Guzman. De Guzman, in turn, proffered a theory attributing the bathroom water damage to groundwater infiltration due to the non-installation in the basement of a four-inch gravel sublayer, perimeter drain, and sump pit and pump. (*See generally* Aug. 25 Tr. at 158–60 (de Guzman); Aug. 26 Tr. at 5–11 (de Guzman).) De Guzman testified about how those components, if installed, would have worked together to mitigate any groundwater: groundwater would first be collected in the gravel sublayer, at which point it would travel outward to the perimeter drains, and then flow through the perimeter drains to the sump pit where it would be removed by the pump. But without those components, de Guzman opined, groundwater will infiltrate the basement walls:

> Now, what will happen, eventually, if there is no gravel, this water will not break until it hits the bottom of the concrete slab. And as I understand, in the materials theory that the concrete slab is absorbing. It's very porous on some occasion, because water tends to be absorbed by the porosity of the concrete.
>
> What it does is that that will continue until it reaches the top of the concrete slab. Now, when the concrete slab top eventually gets saturated because of the capillary action of water, the base plate that runs through the wall is getting absorbed, the water is absorbing that base plate. And eventually, travels up, because the wood is very porous, and it travels up, up to the point where it reaches a level where the water doesn't have any more hydrostatic pressure. It saturates this area, and eventually becomes moist, which drives the mold to come in. And eventually, it rots the wood in due time.
>
> So in the absence of the perimeter drain, in the absence of the gravel, this thing could happen. And eventually, if you miss any of this component, that will cause some damage.

(Aug. 26 Tr. at 7–8 (de Guzman).) On follow-up from the Court, de Guzman stated that in the scenario he was describing—if groundwater was the source of the damage due to the absence of the various drainage components—he would expect to see water damage throughout the basement, in many different areas, rather than isolated to one specific place. (*Id.* at 9–11 (de Guzman).)[10]

Montano presented Bramel as a rebuttal expert on the issue of causation. Bramel opined that the most likely source of the damage discovered in the bathroom was water condensation coming off the outside of the glass shower wall, running down to the shower seat and into the wall. (Aug. 26 Tr. at 136–37, 139–41, 148 (Bramel).) Bramel opined there was no evidence to support de Guzman's theory that groundwater caused that damage. (*Id.* at 141, 148 (Bramel).)

## CONCLUSIONS OF LAW

### I. The Breach-of-Contract Claim

To prevail on a breach-of-contract claim under D.C. law, "a party must establish (1) a valid contract between the parties; (2) an obligation or duty arising out of the contract; (3) a breach of that duty; and (4) damages caused by breach." *Tsintolas Realty Co. v. Mendez*, 984 A.2d 181, 187 (D.C. 2009). Applying these elements here, Lemus fails to carry the day for two reasons: he failed to prove that any of the challenged plan deviations breached any duty under the parties' contract, and he failed to prove that the damages established by the evidence at trial were caused by any of the construction deviations at issue. The Court takes each point in turn.

[10] De Guzman did not opine at trial that the use of green gypsum board instead of cement board in parts of the shower was the cause of the water damage Lemus discovered in or around March 2022. Instead, the thrust of de Guzman's testimony on that subject was essentially twofold: (1) de Guzman believed the plans required concrete backerboard throughout the shower area, such that Montano's use of green gypsum board as a substitute was inconsistent with the plan requirements (Aug. 25 Tr. at 156–57 (de Guzman); and (2) he agreed with Lemus's counsel that "cement board is more resilient to moisture" than gypsum board (*id.* at 152 (de Guzman)). Those points, of course, are a far cry from opining that Montano's use of the green gypsum board—whether consistent or inconsistent with the plan documents—caused the water damage.

**A. Element of *Breach*.**

It is axiomatic that "[w]ithout a contractual duty, there can be no breach of contract." *Ihebereme v. Cap. One, N.A.*, 730 F. Supp. 2d 40, 48 (D.D.C. 2010); *see also Hawthorne v. Rushmore Loan Mgmt. Servs., LLC*, 2021 WL 3856626, at *6 (D.D.C. Aug. 30, 2021). So, the Court begins with the question of whether Montano agreed to any contractual duty to complete the renovation work that Lemus argues improperly deviated from the approved plans.

"The District of Columbia follows the objective law of contracts, which generally means that the written language embodying the terms of an agreement will govern the rights and liabilities of the parties, regardless of the intent of the parties at the time they entered into the contract, unless the written language is not susceptible of a clear and definite undertaking, or unless there is fraud, duress, or mutual mistake." *Armenian Assembly of Am., Inc. v. Cafesjian*, 758 F.3d 265, 278 (D.C. Cir. 2014) (citation and quotation marks omitted). One gloss on that principle, though, focuses on the question of contract integration. Under D.C. law, a "completely integrated" agreement is one "adopted by the parties as a complete and exclusive statement of the terms of the agreement." *Howard Univ. v. Good Food Servs., Inc.*, 608 A.2d 116, 126 (D.C. 1992). If a contract is completely integrated, then "no additional terms [can] be considered in interpreting the contract," whether consistent terms or inconsistent terms. *Id.* (citing Restatement (Second) of Contracts § 210 cmt. a (A.L.I. 1981)). By contrast, a "partially integrated" agreement—one that is not meant "to be exclusive on all matters of [a] contractual relationship"—can be interpreted using "consistent additional terms" drawn from outside the contract itself. *Id.*

Here, the Court ruled before trial that the March 2019 contract (Jt. Ex. 1) was not completely integrated, meaning the parties could introduce evidence of consistent additional terms in arguing for a particular interpretation. (*See* Min. Order, July 6, 2026.) Lemus followed that

approach. His trial theory rested heavily on the premise that the parties intended the March 2019 contract to be read alongside the approved construction plans to define the full terms of their agreement. Based on the evidence, the Court agrees with that proposition, but only to a point.

The March 2019 contract defined the project's scope of work. It enumerated the specific construction tasks that Montano agreed to take on and the specific budget that Lemus agreed to pay Montano for those tasks. Understanding the March 2019 contract in this way, the Court concludes that the parties intended the plan drawings to further elucidate, where applicable, how and where Montano would complete the enumerated tasks in their contract. For instance, where the contract specified that Montano would "[c]reate a new bathroom shower," the plan drawings supplemented that provision by delineating where the shower should be built, its rough dimensions, and so on. As another example, where the contract specified that Montano would "[c]reate a new utility sink/pet wash area," the plan drawings likewise supplemented that provision by indicating where that feature should be installed, its rough dimensions, and so on. Reading the contract and the plans together in this way shows how the *consistent* additional terms in the construction plans add to the proper interpretation of the parties' broader agreement.

But that does not mean the parties intended to subsume every facet of the plans into the contract, especially to the extent certain workstreams or tasks were not among the enumerated activities stated on a line-by-line basis in the contract. If anything, using the plans in that manner would be tantamount to reading *inconsistent* terms into the contract, especially given the contract's acknowledgement that there would be "additional costs" for "modifications" to the scope of work (*see* Jt. Ex. 1)—a contractual understanding that was borne out by the parties' ensuing course of dealings in negotiating extra payments for added work not originally listed in the March 2019

contract, *e.g.*, the replacement of basement drains, additional HVAC work, and more. (*See* Jt. Ex. 2; Jt. Ex. 85 at 37; Aug. 25 Tr. at 36–37, 43 (Lemus).)

With this understanding in mind, most of Lemus's breach-of-contract theories fail because the Court finds that Montano simply did not contract to perform the work that Lemus claims Montano failed to perform in accordance with their agreement. As to the basement slab and concrete-related tasks, the March 2019 contract specified that Montano would complete the following work within the agreed $50,000 budget: (1) "[l]aying of gravel base"; (2) "[p]ouring of interior concrete to protect the foundation"; (3) "[i]nstallation of moisture barrier"; (4) "[l]aying of reinforcement wire mesh"; and (5) "[p]ouring and trowel finishing of basement concrete floors." (Jt. Ex. 1.) Nowhere does the contract say that Montano would install a perimeter drain, a sump pit and pump, or concrete expansion joints. (*See id.*; Aug. 25 Tr. at 119, 125 (Lemus).) Those omissions strike the Court as particularly notable given the cost estimates that Lemus's own expert identified for that work. De Guzman opined it would cost about $20,000 to install a perimeter drain and a sump pit and sump, and about $1,500 to install concrete expansion joints. (Aug. 26 Tr. at 170, 172 (de Guzman)). Granted, de Guzman explained that the work would be more significant now because of the need to dig up the concrete in certain areas (versus if the work were completed at the time of the original renovation, after the old concrete had already been excavated and before the new slab was poured). But even at a fraction of de Guzman's estimate, the associated costs are still meaningful enough that the parties almost certainly would have memorialized them, whether in the original contract or in some later written documentation—after all, even the additional $1,500 worth of work to replace the basement drains that Montano later agreed to complete, outside the original budget, was something the parties set down in writing. (*See* Jt. Ex. 2.) Thus, because the contract did not include a perimeter drain, a sump pit and pump, and expansion joints

in the agreed scope of work—and because reading those aspects of the plans as additional contractual terms would be inconsistent with the scope of work the parties actually negotiated and captured in their contract—Montano's non-completion of these particular tasks was not a breach of any duty under the parties' agreement.

The contract did specify that Montano would install a gravel base beneath the concrete floor, as reflected above. But the evidence at trial established that Montano did so, just at a depth of around two inches, not four inches. (Aug. 26 Tr. at 29, 32–34, 42–43 (Montano); Jt. Stip. ¶ 6.) The contract itself did not call for any specific gravel depth, so in claiming a breach, Lemus argues that the plans required a four-inch sublayer. The Court disagrees. As explained in the findings of fact above, the plans depicted a schematic for a "*typical* slab," so the Court does not read the accompanying details as rigid and absolute requirements for this project. Moreover, the evidence demonstrated that Montano discussed with Lemus that he would not be installing four inches of gravel, and Lemus sent Montano a confirmatory email acknowledging a different approach on the gravel than Lemus says was required by the plans. (Aug. 26 Tr. at 29, 32–34, 42–43 (Montano); Jt. Ex. 24.) Given that acknowledged understanding, even assuming *arguendo* that Montano did originally contract to install four inches of gravel (and the Court does not so find), the parties' later discussion on the topic operated as an amendment to any such original understanding, separately defeating any claim that Montano breached their contract when it came to the gravel base.

That leaves Montano's use of the green gypsum board rather than concrete board for certain areas of the shower enclosure. On that subject, the contract did specify that Montano would create "a new bathroom shower," but it did not call for the use of any specific construction material behind the tile. (*See* Jt. Ex. 1.) Lemus, once again, points to the plans, which include a "bathroom wall detail" specification that indicates "1/2" Durock/cement board or 1/4" Hardibacker" for the

interior shower walls. (Jt. Ex. 38.) But based on the record developed at trial, the Court does not construe that plan specification as a contractual term adopted by the parties, particularly without any evidence that a specific material—whether cement board or gypsum board—was required by code. In fact, the evidence showed that both materials were code-compliant when this work was done in 2019. (Aug. 26 Tr. at 56 (Montano); Aug. 26 Tr. at 133-35 (Bramel); Aug. 25 Tr. at 212-13 (de Guzman).) Because no contractual term required Montano to use cement board, Montano did not breach the parties' contract by using gypsum board in certain areas of the shower.

As a final point, the Court turns to Lemus's broader theory about Montano's agreement to perform the renovation work in accordance with "all applicable codes." Based on the Court's assessment of the evidence, it does not find that Montano made any sort of categorical promise along the lines Lemus suggests. As support at trial, Lemus primarily relied on aspects of Montano's answer to the amended complaint, admitting that the renovation "work was to be performed in accordance with 'applicable codes.'" (ECF No. 73 ¶¶ 32, 108-9, 111–13, 117, 120.) But Montano qualified those admissions with relevant disclaimers, denying that the "applicable codes" required adherence to every specification and detail reflected in the plans. (*Id.* ¶¶ 108–13, 117, 120.) Similarly, when Montano was asked on the witness stand about his agreement to follow applicable codes, his testimony was comparably contextualized. (Aug. 26 Tr. at 39–40, 66–68 (Montano).) Viewed holistically, then, the Court finds that, to the extent the parties discussed Montano completing the work in accordance with "applicable codes," any statement along those lines is properly understood as representing that Montano's completed work would be code-compliant and pass all necessary inspections. And based on the evidence at trial, it was and it did.

### B. Elements of Causation and Damages

"Besides nominal damages, a plaintiff may recover through a breach of contract claim only those damages for which they can establish the breach of contract was the proximate cause." *G&E Real Est., Inc. v. McNair*, 2022 WL 17356860, at *8 (D.D.C. Dec. 1, 2022) (citing *Exec. Sandwich Shoppe, Inc. v. Carr Realty Corp.*, 749 A.2d 724, 736–37 (D.C. 2000); *Bedell v. Inver Hous., Inc.*, 506 A.2d 202, 205 (D.C. 1986)). Put another way, a breaching defendant can only be "liable for such damages as are the natural consequence and proximate result of his conduct." *Exec. Sandwich Shoppe,* 749 A.2d at 736–37 (D.C. 2000) (citing *Murphy v. O'Donnell*, 63 A.2d 340, 342 (D.C. 1948)). Although a "plaintiff need not prove damages with mathematical certainty, there must be some reasonable basis on which to estimate damages." *Garcia v. Llerena*, 599 A.2d 1138, 1142 (D.C. 1991) (citation omitted). Simply stated, damages "may not be based on speculation or guesswork." *NCRIC, Inc. v. Columbia Hosp. for Women Med. Ctr., Inc.*, 957 A.2d 890, 902 (D.C. 2008) (citation omitted). Applying these principles here, the Court finds that Lemus failed to prove any damages caused by the alleged breaches underpinning his claim.

Lemus did incur about $22,000 in costs to demolish and rebuild the bathroom shower area after discovering water damage in March 2022, and the Court finds that Lemus sufficiently established the fact of those damages to a reasonable certainty based on the invoices and accompanying evidence at trial. (Jt. Exs. 7, 9, 10, 12, 13.) But he came up short in demonstrating that those damages were *caused* by the specific deviations he challenges as contractual breaches.

Lemus's causation theory hinged on the testimony of his expert witness, de Guzman, who tied the relevant damage to groundwater. More specifically, de Guzman opined that the water damage in the bathroom was caused by groundwater that was not properly drained from the

basement due to the absence of a sufficient gravel sublayer in the concrete floor, a perimeter drain, and a sump pit and pump. For several reasons, the Court is not persuaded by that opinion.

First, the damage Lemus discovered in March 2022 was isolated to the bathroom area of the basement, behind and adjacent to the shower. There was no evidence presented showing any other water damage discovered in the basement around that time, whether along the floor joints, in any other walls around the basement, or elsewhere. Yet de Guzman acknowledged that under his theory of causation—groundwater infiltration due to inadequate drainage mitigation—he would expect to see similar water damage across multiple areas in the basement, not just one specific location like the bathroom wall. (Aug. 26 Tr. at 9–11 (de Guzman).) Second, under de Guzman's groundwater theory, the water would have infiltrated the wall from the floor up, so the Court finds it significant that the water damage Lemus discovered in the wall was located several feet off the floor (Pl.'s Ex. 15), without any evidence reflecting similar damage on the lower part of the wall or near the floor joint. Third, the water damage seemingly did not materialize until March 2022, more than two years after Montano completed the renovation work, and only after Lemus began using the basement shower on a more regular basis. That timing seems far more indicative of water damage stemming from some type of shower-related issue, rather than a potential problem with broader basement drainage and groundwater concerns that would have been extant for years. Fourth, and relatedly, there was no evidence presented of any similar water damage after Greenwood completed its remediation work on the shower. Because the drainage components underlying de Guzman's theory remain unimproved through today—*i.e.*, the gravel remains unchanged and there is still no perimeter drain or sump pit and pump—the Court would expect to see at least some similar water damage occurring at some point over the last four years if groundwater were the culprit. Finally, other evidence from Roto-Rooter—who initially

investigated the water damage in April 2022—and Greenwood Construction—who demolished and rebuilt the shower during that same timeframe—undercuts de Guzman's groundwater theory. Roto-Rooter attributed the damage to "leaks … from shower tiles" (Jt. Ex. 11), and according to Lemus, Greenwood told him there was no "easy fix" to the problem because "it was obvious that water was going through the tiles and in different directions" (Aug. 25 Tr. at 67 (Lemus)). To be clear, the Court is not crediting either of those assessments as a conclusive determination as to the cause of the damage. But that evidence, from other disinterested parties who examined the water damage at or near the time it was originally discovered in 2022, cuts against de Guzman's theory attributing the cause of the damage to insufficient groundwater drainage due to the absence of the construction components Lemus believes Montano wrongly failed to complete.

These points, certainly taken together, are amply sufficient to support the Court's findings on the issue of causation. But as an added consideration, the testimony of Montano's expert, while not necessary to the Court's analysis, bolsters its confidence in the result. Bramel opined that the source of the damage was far more likely to have been attributable to water condensation coming off the outside of the glass shower wall, running down to the shower seat and then onto the wall. (Aug. 26 Tr. at 136–37, 139–41, 148 (Bramel).) Bramel testified there was no evidence to support de Guzman's theory that groundwater caused that damage. (*Id.* at 141 (Bramel) ("If it was a problem with groundwater, it would have occurred at any point in time. It would have been independent of when the shower was being used.").) The Court found Bramel's testimony on these points to be credible, persuasive, and consistent with the rest of the evidence discussed above.

Lemus separately seeks damages for the estimated costs to implement various basement drainage improvements recommended by de Guzman, including installation of a perimeter drain, a sump pit and pump, trench drains, concrete expansion joints, and more. Even setting aside that

none of these claimed damages can be tied to any contractual breach on Montano's part—given the Court's finding that the parties never contracted for Montano to complete those construction tasks in the first instance—Lemus's evidence failed to establish the amount of the claimed damages associated with de Guzman's recommendations to a reasonable certainty. Quite the opposite: de Guzman repeatedly acknowledged that his proffered cost estimates (totaling around $25,000) were "guesstimates" and that he could not "close the gap between [a] guesstimate and the actual cost" without completing more quantifiable steps that, for whatever reason, he did not complete. (Aug. 25 Tr. at 176-77 (de Guzman); Aug. 26 Tr. at 11-12 (de Guzman).)[11]

* * *

Because Lemus failed to prove that Montano breached any contractual duty he owed under their agreement, and because Lemus failed to prove any resulting damages caused by the alleged breaches in any case, the Court finds for Montano on the breach of contract claim in Count II.

## II. The CPPA Claim

The District of Columbia's CPPA is "a broad consumer protection statute," *District of Columbia v. Facebook, Inc.*, 340 A.3d 1, 4 (D.C. 2025), enacted to protect "consumers against false, deceptive, or unfair business practices," *Earth Island Inst. v. Coca-Cola Co.*, 321 A.3d 654, 663 (D.C. 2024). The statute "establishes an enforceable right to truthful information from merchants about consumer goods and services[.]" *Facebook, Inc.*, 340 A.3d at 4 (quoting D.C. Code § 28-3901(c)). Relevant here, subsection (e) prohibits a "misrepresent[ation] as to a material fact which has a tendency to mislead[,]" while subsection (f) prohibits a "fail[ure] to state a

[11] The Court acknowledges that Lemus introduced several photographs that depicted cracks in the basement concrete floor. (Pl.'s Exs. 95–100, 104.) But to the extent Lemus intended to seek damages associated with those cracks, he failed to introduce any evidence quantifying his claimed damages or even connecting them to the alleged breaches. Even if he had, it is not clear that any recovery would follow because Montano took steps to repair those cracks during the renovation work in 2019, and then Lemus unilaterally chose to hire another contractor to finish that work. (Aug. 26 Tr. at 45–48 (Montano); Aug. 27 Tr. at 33–35 (Lemus).)

material fact if such failure tends to mislead[.]" D.C. Code § 28-3904(e), (f). "There is no requirement that the alleged misleading statement or omission … be willful or intentional," at least for purposes of these subsections. *Earth Island*, 321 A.3d at 664 (citation omitted). More, "there is no requirement that [the] consumer in fact be misled by the deceptive statements." *Id.* Finally, "a claim of an unfair trade practice is properly considered in terms of how the practice would be viewed and understood by a reasonable consumer." *Galvin v. Ruppert Nurseries, Inc.*, 341 A.3d 1165, 1174 (D.C. 2025) (internal quotation marks omitted).

The CPPA provides for the recovery of either "treble damages" or statutory damages of "$1,500 per violation, whichever is greater[.]" D.C. Code § 28-3905(k)(2)(A)(i). Here, Lemus seeks treble damages totaling more than $144,000 based on his claimed expenses to rebuild the bathroom shower area to implement the various drainage improvements recommended by de Guzman. For the same reasons already explained, though, Lemus's failure to establish a causal link between those damages and the challenged plan deviations—and his concomitant failure to prove up at least some of those damages to a reasonable certainty (but rather only as "guesstimates")—precludes recovery of actual damages, trebled or otherwise, under the CPPA.

But that is not the end of the analysis. Because even absent actual damages, the CPPA still permits recovery of statutory damages—a "default payment"—of $1,500 per violation. *See Beck v. Test Masters Educ. Servs., Inc.*, 994 F. Supp. 2d 98, 102 (D.D.C. 2014). It is not clear that Lemus ever pled or pressed a claim for default statutory damages under the CPPA. His operative complaint does not include any reference to statutory damages (*see* ECF No. 38), and his arguments at trial were almost entirely focused on actual damages. But in the interest of completeness, the Court explains why even statutory damages are not warranted in this case

because Lemus failed to establish, from the vantage of a reasonable consumer, any material misrepresentation or omission by Montano related to his work on Lemus's project.

Start with Lemus's theory of affirmative misrepresentation. Lemus says Montano told him that the renovation work would comply with all "applicable codes." Lemus then bakes into that language an unspoken assurance that Montano meant he would follow each and every detail of the construction plan drawings because, according to Lemus, the "applicable codes" required strict adherence to the approved plans. Added together, then, Lemus argues that by departing from the construction plans, Montano's statement that his work would comply with "applicable codes" was materially misleading. This claim, which is essentially a repackaging of one of Lemus's breach-of-contract theories, comes up short under the CPPA. Based on the evidence at trial, the Court finds that a reasonable consumer would not equate a representation about a contractor's intention to complete their work in compliance with "applicable codes" with an assurance that the contractor will deliver every construction feature and every precise specification reflected on the plan drawings—at least not when the consumer sourced the plan drawings independently from the contractor (as here), and not when the consumer and the contractor separately negotiated a contractual scope of work that did not include many elements of the plan drawings (as here). Rather, the Court finds that a reasonable consumer in Lemus's position would interpret a representation about compliance with "applicable codes" as stating that the contractor's work will be code-compliant and pass inspection. And here, Montano's work met both expectations.

Lemus's misrepresentation-by-omission theory fares no better. Lemus accuses Montano of material and misleading omissions because Montano supposedly did not inform Lemus about the challenged deviations from the construction plans. The Court is not persuaded.

First, return to the Court's earlier finding that many of the construction deliverables that form the basis for this claim—the absence of a perimeter drain, a sump pit and pump, and concrete expansion joints—were not part of the scope of work the parties memorialized in their March 2019 contract. (*See* Jt. Ex. 1.) More, recall that Lemus obtained the constructions plans on a separate track without Montano's involvement, and recall that Lemus is the one who prepared the March 2019 contract. (Aug. 25 Tr. at 26, 30, 35–36 (Lemus).) Against that backdrop, the Court finds that a reasonable consumer in Lemus's position would not have expected Montano to construct elements of the plan drawings that were not included in the agreed scope of work, meaning that Montano's alleged failure to disclose any such deviations cannot have been a material omission.

Plus, the evidence reflects that Montano did, in fact, disclose and discuss with Lemus most of the tasks that Lemus says he should have completed but did not. Montano testified that after excavating the old concrete slab and discovering the depth of the footings, he realized it would not be possible to install a perimeter drain or sump pit or pump because that work would have required him to excavate further, which was not allowed under the approved permit, and which Montano says he discussed with Lemus. (Aug. 26 Tr. at 29–30, 40–41, 81–84, 89 (Montano).) Lemus denied any such discussion, but the Court credits Montano over Lemus on that point.

Next, Montano likewise discussed with Lemus the fact that he would not be installing a four-inch gravel sublayer. As part of the same discussion just summarized, Montano told Lemus that he could not install four inches of gravel because that would cause the basement ceiling to be non-compliant with the necessary height requirement. So, Montano installed two inches instead of four. (Aug. 26 Tr. at 29, 32–34, 42–43 (Montano).) And as noted already, Lemus sent an email acknowledging their discussion about the gravel sublayer; while the details of that email do not exactly align with Montano's testimony—in that Lemus wrote that they discussed not installing

any gravel, versus Montano testifying that he installed two inches rather than four—the fact remains that Montano informed Lemus about a gravel sublayer that would be different from what Lemus claims was required by the plans. (Jt. Ex. 24.) Undeterred, Lemus says that Montano still omitted material facts because even if Montano disclosed that he was not installing four inches of gravel, Montano did not make clear that the plans *required* four inches of gravel. But, as explained in the factual findings above, the Court does not read the plans as requiring four inches of gravel sublayer; they simply depict a *typical* slab that was not necessarily required for this project. Because the plans did not require four inches of gravel, Montano's failure to advise Lemus of that fact was not a misrepresentation by omission, and certainly not a material one.

Finally, the parties agree that Montano did not specifically tell Lemus that he used green gypsum board instead of concrete board as a construction material in certain areas of the basement shower enclosure. But the evidence established that both materials were allowed by code. (Aug. 26 Tr. at 56 (Montano); Aug. 26 Tr. at 133–35 (Bramel); Aug. 25 Tr. at 212–13 (de Guzman).) So, even assuming the plans could be read as *requiring* the use of concrete board, the Court does not find that Montano's use of a code-compliant, substitute construction material in parts of the shower build was a substantial departure from the plans, which means that Montano's non-disclosure of that departure was not a material omission.

* * *

In sum, because Lemus did not prove any actual damages caused by the alleged violations, and because Lemus did not prove that Montano made any material misrepresentations or omissions under the CPPA in any event, the Court finds for Montano on the CPPA claim in Count I.

## CONCLUSION

There is no question that Lemus experienced water damage in his relatively new basement bathroom several years ago. Lemus was understandably upset by that discovery, and, based on the evidence it saw, the Court understands why Lemus believes that something beyond normal wear-and-tear was to blame. Even the parties' competing experts were aligned on that general point. But unfortunately for Lemus, for purposes of this case and his efforts to hold Montano responsible, he failed to prove that the challenged aspects of Montano's construction work—the non-installation of a four-inch gravel sublayer, perimeter drain, sump pit and pump, concrete expansion joints, and concrete board throughout the entire shower area—amounted to a breach of the parties' contract or any CPPA violation, and he failed to prove that those challenged deviations caused the water damage that gave rise to this suit. Accordingly, the Court finds in favor of Montano and against Lemus on the remaining claims, and it will enter judgment for Montano.

Matthew J. Sharbaugh

Digitally signed by Matthew J. Sharbaugh
Date: 2026.09.14 10:34:29 -04'00'

Dated: September 14, 2026

MATTHEW J. SHARBAUGH
United States Magistrate Judge